917 So.2d 491 (2005)
Robert T. CREEL and Linda Dubroc Creel
v.
SOUTHERN NATURAL GAS COMPANY and C.L. Sloan Engineering, Inc.
No. 2003 CA 2761.
Court of Appeal of Louisiana, First Circuit.
October 14, 2005.
Rehearing Denied December 22, 2005.
*493 Jacques F. Bezou, Covington, Counsel for Plaintiff/Appellee Robert T. Creel and Linda Dubroc Creel.
Grady S. Hurley, The Woodlands, TX, Counsel for Defendant/Appellant Southern Natural Gas Company.
Trudy H. Oppenheim, New Orleans, Counsel for Defendant C.L. Sloan Engineering, Inc.
Before: GUIDRY, PETTIGREW, and GAIDRY, JJ.
GAIDRY, J.
In this litigation involving an encroaching building on a recorded right-of-way, the trial court entered judgment in favor of the encroaching servient estate and *494 awarded monetary damages, and the dominant estate appeals. We affirm in part and reverse in part.

FACTS AND PROCEDURAL HISTORY
On November 19, 1998, Robert and Linda Creel entered into an Act of Sale to purchase 3.38 acres of land on Patrick Lane in St. Tammany Parish for $25,500.00. At the time the Creels first found the Patrick Lane property, they had sold their house and had been living in a camper behind Mr. Creel's office for approximately one year. Mr. Creel is a licensed general contractor, and the Creels' plan was to build a house on the Patrick Lane property, live in it for about four years, then sell it and build a smaller home. The Creels had hoped to make a $60,000.00 to $85,000.00 profit on the home in four years' time.
The Patrick Lane property was bisected by a Southern Natural Gas ("SNG") right-of-way ("ROW"), which was granted by the Creels' predecessors in title and which was recorded in the Louisiana Public Records in Book 210 at page 483. Public Records show that three interstate natural gas pipelines were laid by SNG within its ROW in 1954, 1958, and 1969. At the time the ROW was granted to SNG, it was not known how many pipelines would be laid; therefore, the ROW agreement provided that a ninety-foot ROW would be established after the first pipeline was laid, with the centerline of the ROW set thirty feet west of the pipeline.
A title search obtained by the Creels before purchasing the property revealed that a SNG ROW ran through the property. The Creels also had a surveyor locate the corner posts of the property prior to the purchase, and this survey also showed a ROW on the property. However, the Creels never looked at the ROW documents which had been filed into the public records or had SNG locate their ROW until after the home was built.
At the time the Creels purchased the property, it was wooded, but there was a strip through the property that had been cleared and maintained by SNG. Prior to clearing the property and constructing a home on it, Mr. Creel contacted C.L. Sloan, of C.L. Sloan Engineering, Inc., a licensed engineer and land surveyor, to determine the location of the property's boundaries and the SNG ROW. Mr. Creel testified that he asked Mr. Sloan to "survey the markers and to make sure that the ROW was marked correctly." Prior to Sloan's survey, there were no markers for the ROW on the Patrick Lane property. There were pipeline markers on either side of the Creels' property, but none actually within the property's boundaries. Mr. Creel stated that he expected that Sloan would check the ROW documents filed in the public records when surveying the ROW. Sloan did not personally survey the Creels' property, but instead hired an unlicensed land man named Terry Jones to perform the survey. In a letter to the Creels' attorney, Sloan set forth how he marked the SNG ROW:
We found the S.N.G. 4 inch diameter steel pipe gasline markers 200 feet to 300 feet east and west of the Creel property (there were no markers within the property). Using these as the baseline markers we laid out a line generally NW-SE between them. We then set lines 45 feet from and parallel to this. We set stakes at the intersections of these lines and the Creel property lines.... For a boundary survey, the surveyor must rely upon markers set by S.N.G. to lay out such a R.O.W.
Although Sloan had performed surveys for Mr. Creel on numerous occasions in Mr. Creel's capacity as a general contractor, *495 this was the first time in his career that Sloan had ever performed a pipeline ROW survey. The Sloan survey of the SNG ROW was in error by 67.8 feet; thus the location Mr. Creel chose for the home based on the survey actually encroached on SNG's ROW by 7.8 feet.
A licensed professional land surveyor, John Charles Mattingly, testified on behalf of SNG as to the correct way to perform a pipeline ROW survey. He stated that he would first find the boundaries of the property and make sure there are no discrepancies, then he would get a copy of the deed to see what was actually purchased, and a copy of the subdivision plat to make sure the boundaries are correct. Next, to locate the pipeline ROW, he would obtain a copy of the ROW documents and probe the pipelines to find out exactly where they are. Specifically, in this case, he described the process as follows:
We'd probe the first line out, once they told us which line was the first one, which was the 20 inch line, the eastern most line. We'd probe each side of the pipe until we scrape it with the edge of the probing rod on both sides and we got the measure over half way and go down with it right then. And that's how we mark the center of the pipe. Once you locate that pipe all the way through the property, we would then offset 30 feet to the westerly direction. That would give us the center line of the right-of-way. Once we got the center line of the right-of-way, we offset that 45 in both directions. That gives us the whole 90 foot right-of-way, the exact location of the right-of-way, because the whole [ROW] document is based on where the line is actually laid.
Mattingly actually surveyed the pipeline ROW on the Creels' property in August of 2002 using this method. Mattingly testified that the minimum standards for surveyors require that a surveyor locate a ROW if he knows there is an encumbrance on the property he is surveying.
SNG representatives came out three times while Mr. Creel was working on the house. The first time anyone from SNG came out was around February of 1999, after Mr. Creel began clearing the property. Mr. Creel stated that a SNG representative arrived in a SNG truck and told him that a pilot patrolling the ROW for SNG had seen the survey markers in the ROW[1] and had notified SNG so that they could investigate. Mr. Creel told the SNG representative that he was building a house and pointed out approximately where he would be building. The man asked if Mr. Creel was aware of the ROW, and Mr. Creel told him that he was. The SNG representative did not have any ROW documents with him and did not take any measurements or tell Mr. Creel that the planned placement of his house would or would not encroach on the ROW.
The second visit came in approximately March of 1999, when Mr. Creel was forming the slab for his house. A SNG representative came by in a SNG truck, but Mr. Creel was busy working on the slab and didn't talk to him. The SNG representative spoke with Mrs. Creel about what could be planted along the ROW.
Once the house was up and the brick was being laid, a third SNG employee came out. He told Mr. Creel that one of their pilots had noticed construction within a certain distance of their ROW, and Mr. Creel helped this SNG representative measure the distance from the corner of the house to the line between the stakes in the ROW with a measuring tape. Mr. Creel did not discuss with the SNG representative *496 the location of the pipelines within the ROW. The SNG representative made a sketch while he was out there, which he took with him. Mr. Creel later received a document entitled "Class Location Field Report" from SNG, which was based on the sketch made by the SNG representative and showed both the ROW and the house. This sketch indicated that the house was approximately sixty feet off of the ROW.
Neither Mr. Creel nor Mrs. Creel ever discussed the location of the ROW with any of the SNG representatives or asked whether Sloan's survey markers were accurately placed.
The first time the Creels learned about the problem with the ROW was in February of 2000, after they had been living in the house for six or seven months. At that time, Mrs. Creel came home and discovered a metal post behind the patio with a warning sign for high pressure gas lines. There was also a note stuck to the Creels' door directing them to call SNG about a possible problem. The Creels discovered at that time that the ROW had been marked incorrectly, that the clear-cut area was not the ROW, and that their house encroached on SNG's ROW by 7.8 feet
The Creels filed suit against C.L. Sloan Engineering, Inc. and SNG after discovering that their newly-constructed home encroached onto the recorded servitude. SNG filed an Exception of No Cause of Action, an Answer and Reconventional Demand against the Creels, a Cross-Claim against C.L. Sloan Engineering, Inc., and a Motion for Summary Judgment. After denying SNG's exception and motion for summary judgment, the trial court conducted a bench trial, at which time the following testimony was presented:
Mr. Creel stated that, as a general contractor, he had to be aware of easements and servitudes when building, and often obtains surveys himself for this purpose. He was also aware of Louisiana One Call, which can be called before beginning construction to have utility companies come out and mark their facilities. Louisiana One Call takes calls from excavators around the state, maps the information given by them, and sends it to the member utility companies, pipelines, or municipalities in the area. Mr. Creel admits that he did not call Louisiana One Call before beginning construction because he believed he was not building his home anywhere near the SNG ROW.[2] However, Thelma Latham, a Louisiana One Call employee, testified that Washington-St. Tammany Electric called Louisiana One Call before putting in poles on the Creels' property, and Louisiana One Call processed this information and sent it to its members, including SNG.
Curt Cheramie, a SNG property rights specialist, testified that all of SNG's ROWs are clear-cut. When asked whether as a property rights specialist he warrants that the clear-cut area is the actual survey of the ROW, he stated that he does not. After the Creels' house had been built, Cheramie discovered that SNG had allowed trees to grow over an area of the ROW on the Creels' property, and that those trees had probably been growing since 1969 when the last pipeline was laid.
Although the pipeline caused no structural damage to the home, and no structural modifications were necessary because of the pipeline, Mr. Creel testified that their use and enjoyment of the home has been limited. The Creels had planned to put in a swimming pool behind their house, but can no longer put one in their chosen *497 location because of the location of the ROW. Mr. Creel said the location where they would now be able to place a swimming pool is too far from the back of the house to be practical, so they are not going to build one. Mr. Creel had also planned to build a second garage at the back of the driveway, so that he could either drive straight into the back garage or park his car in the house garage, but because of the location of the ROW, he can no longer build a second garage in this location. Mr. Creel testified that because he was so disgusted by the whole situation, he had never planted grass and only cut the existing grass when it was about three feet tall. The Creels have not had any social parties since discovering the problem, but they have barbequed in the backyard. Mr. Creel said that had he known there were three pipelines running through the ROW, it would not have affected his decision to buy the property, but would have affected his placement of the house.
Mrs. Creel testified that when she learned that the house was built on the ROW, she was extremely upset and depressed and is still upset. When asked to elaborate on how upset they were, she stated: "Well, you know, we don't enjoy it anymore, because we know there's a problem and couldn't do what we wanted to do, and don't entertain because I have no interest in entertaining, because of the problems that we're having with the right-of-way and the pipe." Mrs. Creel also testified that she was worried about having high-pressure pipelines near the house; however, acknowledged that she knew about the existence of the pipeline ROW before they bought the property, and she wasn't worried because her daughter knew people who had lived around there all of their lives and who said they were not concerned by it.
Mr. Creel also complained that they had been disturbed approximately once a month by the noise and vibrations of a pig[3] moving through the pipeline in the middle of the night.[4] He described the noise made by the pig as "like an electrical transformer getting ready to blow up." He also claimed that during one of these episodes, his whole house shook.
The Creels claim that their plan to sell the house at a profit is no longer possible since no one would finance a house that encroaches on a ROW. However, SNG released a twenty-three foot portion of the ROW so that the Creels' home no longer encroached on the ROW.[5] The Creels have never placed the house on the market.
On March 19, 2003, the trial court rendered judgment in favor of the Creels and against SNG and C.L. Sloan Engineering, Inc. and awarded damages in the amount of $40,000.00 for mental distress and $93,333.33 for the thirty-three percent depreciation in value of the Creels' home. The trial court assigned eighty-five percent of the fault to SNG and fifteen percent to C.L. Sloan Engineering. No fault was assigned to the Creels. SNG appeals the March 19, 2003 judgment, as well as the court's denial of its exception and its *498 motion for summary judgment, and assigns the following trial court errors:
1. The trial court erred in awarding tort damages for detrimental reliance, in contravention of the Louisiana property law and the Public Records Doctrine.
2. The trial court erred in denying SNG's exception of no cause of action, denying SNG's motion for summary judgment, and fashioning a tort remedy based upon its finding that SNG was liable for the Creels' encroachment on SNG's recorded ROW agreement.
3. The trial court erred in finding that SNG owed or breached a duty to the Creels under La. C.C. art. 2315.
4. The trial court erred in apportioning the majority of the fault for the Creels' encroachment to SNG, rather than C.L. Sloan Engineering and Mr. Creel himself.
5. The trial court erred in awarding excessive monetary damages, including damages for emotional harm, when La. C.C. art. 670, which provides the remedy for a building encroaching onto a servitude, does not permit monetary damages to an encroaching servient estate against a dominant estate at all.

DISCUSSION

AVAILABILITY OF TORT REMEDIES
SNG's first assignment of error asserts that the Creels could not make a tort claim for detrimental reliance due to the applicability of the Public Records Doctrine, specifically La. R.S. 9:2721 and 9:2722, which provide:
§ 2721. Filing in office of parish recorder
A. No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease, or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated. Neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties.
B. An act of sale of immovable property or attachment thereto filed for registry in the office of the parish recorder pursuant to Subsection A of this Section shall designate the name of the person responsible for all property taxes and assessments and include the address where property tax and assessment notices are to be mailed. The person responsible for the taxes and assessments of the immovable being transferred shall provide the above information to the tax assessor for the parish in which the immovable property is located for the purpose of issuing tax and assessment notices.
C. Anyone who acquires immovable property in this state, whether by sale, sheriff's sale, giving in payment, or in any other manner, which property is subject to a recorded lease agreement that is not divested by the acquisition, shall take the property subject to all of the provisions of the lease, including any provision for the payment of a commission to a leasing agent or other third party, provided that the lease was recorded prior to the recordation of the document which establishes the rights of the person who acquires the property. Such document shall include but is not limited to a mortgage, option to purchase, or other writing.
§ 2722. Persons protected
Third persons or third parties so protected by and entitled to rely upon the *499 registry laws of Louisiana now in force and effect and as set forth in this Chapter are hereby redefined to be and to include any third person or third party dealing with any such immovable or immovable property or acquiring a real or personal right therein as purchaser, mortgagee, grantee or vendee of servitude or royalty rights, or as lessee in any surface lease or leases or as lessee in any oil, gas or mineral lease and all other third persons or third parties acquiring any real or personal right, privilege or permit relating to or affecting immovable property.
SNG also cited Brown v. Johnson, 11 So.2d 713 (1942), in which the court held that all persons have constructive notice of the existence and contents of a recorded instrument affecting immovable property, and where such an instrument contains language that fairly puts a purchaser on inquiry as to the title and he does not avail himself of the means and facilities at hand to obtain knowledge of the true facts he is to be considered as having bought at his own risk and peril. Brown at 716.
The law cited by SNG concerning the effect of recording a ROW is not persuasive in this case. It is true that the recordation of the ROW prevents the Creels from contesting the existence or extent of the ROW. However, the Creels are not seeking to have the court declare that SNG does not have a ROW on their land or in a certain location on their land; in fact, this is not necessary because SNG willingly gave up a portion of the ROW to the Creels so that their house would not encroach upon the ROW. The Creels' suit is one in tort for damages arising out of their detrimental reliance on SNG's assertions as to the location of the ROW. Certainly, the fact that the location of the ROW was recorded in the public records goes toward comparative fault, but it does not preclude the Creels from bringing their tort claim.

WHETHER SNG OWED A DUTY TO THE CREELS AND BREACHED THAT DUTY
Under a duty-risk analysis, the plaintiff has the burden of proving five elements: (1) the defendant had a duty to conform his or her conduct to a specific standard, (2) the defendant breached that duty, (3) the defendant's conduct was a cause-in-fact of the plaintiff's injuries, (4) the defendant's conduct was the legal cause of the plaintiff's injuries, and (5) the plaintiff suffered actual damages. Bowman v. City of Baton Rouge/Parish of East Baton Rouge, XXXX-XXXX, p. 5 (La. App. 1 Cir. 5/9/03), 849 So.2d 622, 626, writ denied, XXXX-XXXX (La.10/3/03), 855 So.2d 315 (citing Joseph v. Dickerson, 99-1046, 99-1188 (La.1/19/00), 754 So.2d 912, 916).
Whether a duty is owed is a question of law. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La. 1984). A duty can be assumed that does not otherwise exist, which renders the obligor liable for any breach of that duty. Ratliff v. State, Department of Transportation and Development, XXXX-XXXX, p. 12 (La.App. 1 Cir. 3/28/03), 844 So.2d 926, 936, writ denied, XXXX-XXXX (La.10/10/03), 855 So.2d 350. Whether a defendant has breached an established duty is a question of fact. Pinsonneault v. Merchants & Farmers Bank & Trust Company, 2001-2217, p. 11 (La.4/3/02), 816 So.2d 270, 278.
Due to the fact that SNG's ROW was duly recorded in the public records, SNG owed no duty to ensure that the Creels were aware of the existence or extent of the servitude. However, their actions in clearing and maintaining a strip of land across the Creels' property and in going out to discuss the ROW with the Creels amounted to a voluntary assumption of a duty to not mislead them as to the *500 location of the ROW. It is reasonably foreseeable that the Creels would assume that the clear-cut area was the ROW, and presumably that area was clear-cut because SNG also thought that it was the ROW. Additionally, SNG employees went out to the construction site several times to discuss the ROW with the Creels and to ensure that they were aware of its existence. Although SNG employees were there to discuss the servitude while the slab was being formed, they never informed the Creels that the clear-cut area was not the ROW and that their house was encroaching on the actual ROW. Based upon the facts of this case as contained in the record, we find no error in the trial court's conclusion that SNG breached its assumed duty to the Creels to not mislead them as to the location of the ROW.

APPORTIONMENT OF FAULT
Like all factual findings, the standard of review of comparative fault allocations is that of manifest error. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). The court in Watson listed a number of factors to be considered in determining the portion of fault attributable to the parties, including the level of the risk; whether the behavior was inadvertent or done with awareness of the danger; the significance of what was sought; the capacities of the parties; and any other extenuating circumstances. Watson at 974.
We have considered the Watson factors in light of the particular facts of this case as outlined above, and conclude that while we may have allocated fault differently, we cannot say that the trial court committed manifest error in making its allocation.

AVAILABILITY OF MONETARY DAMAGES UNDER CIVIL CODE ARTICLE 670
Louisiana Civil Code article 670, entitled "Encroaching building," provides:
When a landowner constructs in good faith a building that encroaches on an adjacent estate and the owner of that estate does not complain within a reasonable time after he knew or should have known of the encroachment, or in any event complains only after the construction is substantially completed the court may allow the building to remain. The owner of the building acquires a predial servitude on the land occupied by the building upon payment of compensation for the value of the servitude taken and for any other damage that the neighbor has suffered.
SNG argues on appeal that Article 670 provides the remedy for a building encroaching on a servitude and does not permit monetary damages to an encroaching servient estate against a dominant estate. However, this article actually governs the remedies available to a landowner whose property is encroached upon by a neighboring landowner's building. The remedy available under Article 670 in a case where the owner of the encroached-upon land does not complain of the encroachment within a reasonable time is the creation of a predial servitude upon the land occupied by the encroaching building. This article is not applicable to the Creels' situation, where the Creels' building encroaches on a servitude on their own land, rather than encroaching on someone else's land. Application of this article to the instant situation would be nonsensical  the Creels would acquire a predial servitude on SNG's servitude on the Creels' land. This argument by SNG is without merit.

QUANTUM
The discretion vested in the trier of fact in fashioning an award of general damages is great, and even vast, *501 so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

Depreciation of the Creels' House
Regarding the depreciation in value of the Creels' home, the trial court held:
[D]efendant SNG has released a portion of the property from their right-of-way thereby providing the necessary setback from the right-of-way to enable the home to receive FHA financing.
The testimony of the appraiser presented by the defendant was to the effect that the close proximity of the plaintiffs' home to the high pressured gas line should have no impact as to the value. Although the appraiser for the plaintiff could not set forth a specific case wherein she found the exact facts of the case before this Court, she did testify that she has seen instances where properties backing up to a servitude with high power electrical lines had a ten (10%) percent reduction in their value. Furthermore, as she pointed out in her testimony, high powered electrical lines have not been known to explode as a high pressured gas line might. The Court finds this testimony to be quite persuasive. The Court finds that the close proximity of the high pressured gas line, coupled with the inconvenience of the noise and vibration caused by the cleaning of the gas line, has reduced the value of the plaintiffs' home by one-third (1/3rd). The Court values the plaintiffs' home based upon the appraisal submitted by the plaintiffs, at Two-hundred-eighty-thousand and no/100 ($280,000.00) Dollars.
SNG argues on appeal that the trial court erred in finding that the Creels' house had depreciated by one-third, when neither party's expert attributed that great a depreciation in value to the home's proximity to the gas line. A trial court may accept or reject in whole or in part the opinion expressed by an expert. Hart v. Riverside Medical Center, 2001-2428, p. 4 (La.App. 1 Cir. 11/8/02), 835 So.2d 771, 773. The effect and weight to be given expert testimony is within the broad discretion of the trial judge. Thornton ex rel. Laneco Const. Systems, Inc. v. Lanehart, 97-2871, p. 5 (La.App. 1 Cir. 12/28/98), 723 So.2d 1127, 1130, writ denied, 99-0177 (La.3/19/99), 740 So.2d 115.
Madeline Tonti, an appraiser for the Creels, indicated that she had seen houses depreciate in value due to their close proximity to high-powered electrical lines, and it was her opinion that depreciation due to high-pressure gas pipelines would probably be greater because of the possibility of the pipelines exploding. She did not give an opinion as to the exact amount of the depreciation, but the trial court clearly credited her opinion that the depreciation would be greater than ten percent and arrived at the conclusion that the Creels suffered a thirty percent depreciation in the value of their house. We find no abuse of discretion in this finding.

Damages for Emotional Distress and Mental Anguish
The trial court based its award of damages to the Creels for emotional distress and mental anguish on the following findings:

*502 Given the testimony of both plaintiffs the Court is convinced that the home that they were building was to be their "dream home." They had waited patiently, while living in a trailer behind Mr. Creel's office, for the construction to be completed. Mr. Creel testified that he had called in many of the favors that had been owed to him in order for the home to be constructed in the manner in which they desired. They both testified that it was their plan to build a large shop on the property so that Mr. Creel could keep his cars there and be able to work on them, as well as an in-the-ground pool for the use of their family. Both the plaintiffs testified as to the shock that they felt when they came home to find the pipeline markers located within such close proximity to their home. They were also upset that the large pine trees that they had left as a buffer between their home and what they thought was the right-of-way, had been cut. Consequently, the Court finds that both plaintiffs have suffered significant emotional distress due to this entire occurrence and hereby awards each plaintiff individually Twenty-thousand and no/100 ($20,000.00) Dollars, for their emotional distress and mental anguish.
The cases dealing with the question of damages for mental anguish resulting from injury to one's property reveal several different approaches as to whether or not such damages are recoverable. In Farr v. Johnson, 308 So.2d 884, 885-86 (La.App.2d Cir.1975), the court categorized the cases allowing recovery into four general areas: (1) where the property was damaged by an intentional or illegal act; (2) where the property was damaged by acts giving rise to strict or absolute liability; (3) where the property was damaged by activities amounting to a continuous nuisance; and (4) where the property was damaged under circumstances where the owner was present or nearby at the time the damage occurred and suffered a psychic trauma in the nature of or similar to a physical injury as a direct result of the incident itself.
Every incident of property damage is necessarily accompanied by some degree of worry and consternation over such things as possible financial loss, settlement of insurance claims, and discomfort and inconvenience. The owner of the damaged property may not recover for mental anguish unless he or she proves a psychic trauma in the nature of or similar to physical injury, directly resulting from the property damage. Elston v. Valley Electric Membership Corp., 381 So.2d 554, 556 (La.App. 2d Cir.1980); Thompson v. Simmons, 499 So.2d 517, 520 (La.App. 2d Cir.1986), writ denied, 501 So.2d 772 (La.1987). The "mental anguish" must be a real mental injury. The usual worry over the consequences of property damage (where a plaintiff suffers no direct mental injury from the negligent act) will not justify an award for mental anguish damages.
In this case, the Creels' testimony regarding their emotional distress involved their disappointment at being unable to put in a pool or garage in a preferred location and possibly being unable to resell the house at a profit as they had hoped. Neither party sought any sort of treatment for their emotional distress. This strikes us as nothing more than normal worry associated with having one's property damaged by another, and it was error for the trial court to award damages for mental anguish and emotional distress under these facts.

CONCLUSION
The judgment of the trial court is reversed insofar as it awarded $20,000.00 to Mr. Creel and $20,000.00 to Mrs. Creel for *503 mental anguish and emotional distress, and otherwise affirmed. Costs of this appeal are to be divided equally between SNG and the Creels.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] The survey markers referred to here were the markers placed by Sloan.
[2] He based his belief that he was not building his home anywhere near the ROW on the Sloan survey and his own observation of the area that SNG cleared and maintained.
[3] A "pig" is a device used to clean pipelines.
[4] When asked how he knew it was a pig that he heard at night, Mr. Creel testified that he just assumed it was a pig that he heard. SNG representative Curt Cheramie testified that a pig cannot be heard when standing above ground; an amplifier has to be attached to above-ground piping to enable them to hear the pig. He further testified that the lines on the Creels' property were only pigged twice a year.
[5] The Creels' home encroached on the SNG ROW by 7.8 feet. SNG released that portion of the ROW, plus an additional 15 feet, making the total relinquishment approximately 23 feet.