United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 30, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 06-30449
_____

MICHAEL J. MCLACHLAN; LORI DAVENPORT MCLACHLAN,

Plaintiffs-Appellants,

versus

NEW YORK LIFE INSURANCE COMPANY,

Defendant-Appellee.

--------------------
Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:05-CV-52
--------------------

Before HIGGINBOTHAM, WIENER, and PRADO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In applying for increased life insurance coverage, Michael McLachlan submitted blood and urine samples to his insurer, New York Life. Although the results indicated elevated levels of two chemicals, phosphatase and creatinine, New York Life mentioned only the former in its letter to McLachlan, explaining that it would issue a policy, but with a higher premium given the elevated phosphatase. McLachlan was later diagnosed with kidney failure. McLachlan sued New York Life under general Louisiana negligence law, complaining of the failure to advise him of the elevated creatinine. The district court dismissed the case, concluding that

New York Life neither owed a duty to disclose nor assumed such a duty.  We affirm.

I

Michael McLachlan had life insurance with New York Life. After his first child was born in July 2000, McLachlan applied for increased benefits.  As part of the application, New York Life required him to submit blood and urine samples so that it could determine the appropriate premium.  The samples were forwarded to a laboratory contracted for by New York Life.  That lab reported to New York Life that McLachlan had high alkaline phosphatase levels and an "elevated" creatinine level of 2.1 mg/dL.[1]

New York Life wrote to McLachlan that it had accepted his application, but at a non-preferred rate due to the high alkaline phosphatase levels, which increased his risk for several diseases. McLachlan completed the application process and coverage began.  He told his gastroenterologist of the alkaline phosphatase levels, which they both began to monitor.  His gastroenterologist never screened for creatinine, a decision the Louisiana Medical Review Panel later concluded was not professionally inappropriate.  New York Life never informed McLachlan of his elevated creatinine levels.  McLachlan did not request a copy of the test results and none was sent to him.

---

[1] Creatinine is a waste by-product expelled by the kidneys.  The level of creatinine in the blood is the simplest measure of kidney function.  The normal amount is 0.5-1.5 mg/dL.

McLachlan's creatinine levels continued to rise unchecked, until a subsequent test in December 2001 found a creatinine level of 3.4. Doctors told the thirty-four year old McLachlan that the increasingly elevated creatinine indicated irreversible kidney damage, necessitating a transplant. In pursuing a malpractice claim against his doctors, McLachlan subpoenaed the 2000 test results from New York Life in 2004 and discovered the early indication of the problem.

McLachlan and his wife sued New York Life in a Louisiana federal district court with diversity jurisdiction over their Louisiana law negligence claim. The claim is that the kidney damage could have been prevented had New York Life disclosed the test results when it issued the policy, and that New York Life either had a duty to disclose initially the test results for creatinine or assumed such a duty when it disclosed only his alkaline phosphatase levels. New York Life filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and motion for judgment on the pleading under Rule 12(c), contending that New York Life owed no relevant duty here, even given the facts of the McLachlans' complaint. The district court granted the motion to dismiss.

The McLachlans appeal. We review the district court's ruling *de novo*, taking all facts alleged in the complaint as true and affirming "only if it appears that no relief could be granted under

3

any set of facts that could be proven consistent with the allegations."[2]

## II

This appeal turns on whether New York Life owed a relevant duty to the McLachlans.[3] We note first that the McLachlans do not rely on Louisiana insurance law. And they cannot, because it creates no duty to disclose in the current situation.[4] Rather, the McLachlans rely on general Louisiana negligence law, codified in LA. CIV. CODE arts. 2315 and 2316.

Under Louisiana law, the existence of a duty, and the corollary issue whether the duty extends to protect a particular plaintiff from a particular harm, are questions of law usually

---

[2] *See Abraham v. Singh*, 480 F.3d 351, 354 (5th Cir. 2007) (internal citation and quotation marks omitted).

[3] The McLachlans briefly assert that, under Louisiana law, a categorical "no duty" defense is strongly disfavored; rather, courts generally assume some sort of duty and, if no liability should attach, find no breach. *See Pitre v. La. Tech. Univ.*, 673 So. 2d 585, 597 (La. 1996) (Lemmon, J., concurring). This is at odds with the Louisiana cases holding that the duty inquiry requires analysis of whether the duty *extends* to a particular risk of harm. *See infra* note 5. In any event, even if this case were better analyzed as a "no breach" case, the McLachlans themselves argue nothing but duty after citing *Pitre*. So this case is a "duty" case.

[4] The only provision touching this issue, the provision stating that "[e]very insurer who requires from an applicant for insurance a written authorization to obtain medical records of the applicant shall furnish copies of the medical records received by the insurer to the applicant on written request," LA. REV. STAT. ANN. § 22:2(A)(1) (2004), is irrelevant here because New York Life never sought McLachlans's medical records and McLachlan never requested such records in writing. Relatedly, other provisions explicitly regulate all facets of insurers' HIV testing, LA. REV. STAT. ANN. 40:1300.11 (2004), and none require disclosure of HIV test results without a written request.

4

determined together, case-by-case.[5]  In answering these questions, Louisiana jurisprudence looks to moral, social, and economic factors, including: 1) whether the imposition of a duty would result in an unmanageable flow of litigation; 2) the ease of association between the plaintiff's harm and defendant's conduct; 3) the economic impact on society and similarly situated parties; 4) the nature of the defendant's activity; 5) moral considerations, particularly victim fault; 6) precedent; and 7) the direction in which society and its institutions are evolving.[6]

The McLachlans make two claims here: that New York Life had an affirmative duty to disclose the creatinine information because it was important, and that it assumed a duty to disclose that information when it disclosed the alkaline phosphatase information. We address each in turn.

A

Although there is no recognized affirmative duty to disclose in the exact situation presented here, Louisiana provides a general negligent misrepresentation cause of action where there is a legal duty to provide correct information and the defendant fails to

---

[5] *See Hill v. Lundin & Assocs.*, 256 So. 2d 620, 623 (La. 1972); *Ellison v. Conoco, Inc.*, 950 F.2d 1196, 1204-05 (5th Cir. 1996) (construing Louisiana law).

[6] *See Meany v. Meany*, 639 So. 2d 229, 233 (La. 1994).  Citing *Posecai v. Wal-Mart Stores, Inc.*, 752 So.2d 762, 766 (La. 1999) (deciding whether Sam's Club had duty to protect shopper who was carjacked in store parking lot), the McLachlans argue that foreseeability and gravity of harm are additional, and the most important, factors.  *Posecai*, however, by its own terms analyzed when businesses have a duty to protect their customers from criminal acts of third parties.  The *Meany* factors control here.

disclose or discloses misinformation.[7]  However, in such cases a legal duty to disclose exists only where there was privity of contract or a fiduciary relationship between the parties.[8]  Under Louisiana law, the insurer-insured relationship doesn't give rise to a fiduciary duty[9] and there was no privity of contract between the McLachlans and New York Life.[10]  In one case, *Barrie v. V.P. Exterminators, Inc.*,[11] the Louisiana Supreme Court imposed a duty where there was no privity or fiduciary relationship.  However, in *Barrie* a termite inspector made a faulty report for a seller of a home, and the buyers, intended users of the report, sued.  Here, by contrast, New York  Life purchased the medical tests for its own purposes, not the McLachlans'.

Our conclusion accords with a similar *Erie*-guess made by this court in *Deramus v. Jackson National Life Insurance Company.*[12]  In *Deramus*, the insurance company rejected Deramus's life insurance application after its required blood test found that Deramus had

---

[7] *See Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1016 (La. 1993).

[8] *See Daye v. General Motors Corp.*, 720 So. 2d 654, 659 (La. 1998).

[9] *See, e.g., Nat'l Union Fire Ins. Co. v. Cagle*, 68 F.3d 905, 910 (5th Cir. 1995).

[10] The McLachlans and New York Life had privity regarding the existing life insurance policy, but they did not have privity regarding the anticipated, future policy because an application for increased coverage is a proposed new contract, not an extension of an old contract.  That the contract was eventually entered into does not change anything.

[11] 625 So. 2d at 1016-18.

[12] 92 F.3d 274 (5th Cir. 1996).

HIV. The insurer told him that it had rejected his claim for medical reasons, but nothing more; Deramus tried to learn more, but he could not. After Deramus died of AIDS three years later, his wife sued. The district court, in concluding that the insurer had no duty to disclose under Mississippi law, considered many of the factors that Louisiana courts consider. It observed that insurers mitigate risk, not protect life, and that their testing is only for their own purposes. In light of that, and the fact that the insurer didn't promise to warn Deramus of any medical risks, the court concluded that Deramus shouldn't have expected the insurer to warn him. The court also noted that the insurer didn't set the disease in motion. Turning to the economic and social consequences of its holding, the court observed that holding insurers to the same standards of disclosure as doctors would require an expertise that insurers do not have. Finally, the court noted that the overwhelming majority of courts to have considered this duty have rejected it.[13] The same reasoning applies here.[14]

---

[13] *See, e.g., Eaton v. Continental Gen. Ins. Co.*, 147 F. Supp. 2d 829, 834 (N.D. Ohio 2001); *Doe v. Prudential Ins. Co.*, 860 F. Supp. 243, 252-53 (D.Md. 1993); *Petrosky v. Brasner*, 279 A.2d 75, 78 (N.Y. App. Div. 2001); *Nolan v. First Colony Life Ins. Co.*, 784 A.2d 81, 85-86 (N.J. Super. 2001).

[14] The McLachlans' attempts to distinguish *Deramus* are unconvincing. They argue that Deramus had no privity with his insurer, but McLachlan didn't either. *See supra* note 9. They argue that Deramus was told he was rejected only "for medical reasons," which should've put him on notice of a problem, whereas here Mr. McLachlan was told about the phosphatase, but not the creatinine, but, as we explain later, that partial disclosure didn't create a duty to disclose more. And they argue that Deramus was already stricken with AIDS, raising serious issues of causation, whereas here Mr. McLachlan could've saved his kidneys with sufficient warning, but that goes to causation, not duty.

The McLachlans urge that insurers like New York Life routinely run medical tests for the explicit purpose of discovering abnormal results, and it would be cheap and easy to either forward the complete results to applicants or simply notify applicants of anything labeled "elevated" or "out of the ordinary," perhaps in the same letters the insurers send with the finalized premium, and that the risk of harm is great because applicants may not otherwise discover serious ailments. We aren't so sure. It's difficult to foresee the practical impacts of imposing a duty here – what insurers would have to test for or would have to disclose. The risk that applicants may not otherwise discover serious ailments is not a risk created or borne by the insurer.[15]

We recognize that a recent Tenth Circuit opinion, *Pehle v. Farm Bureau Life Insurance Company*,[16] suggests a contrary conclusion. In *Pehle*, the insurer failed to inform Pehle of his HIV-positive status in its letter rejecting coverage "based on blood results" and advising Pehle that it would disclose the results "if he so wished." The court, applying Wyoming law, held that the insurer had a "duty to disclose to the applicant

---

[15] *Cf.* Hannah E. Greenwalk, *What You Don't Know Could Save Your Life: A Case for Federal Insurance Disclosure Regulation*, 102 DICK. L. REV. 131 (1997) (arguing for Congress to impose a duty by statute); *but see* Ronald Pelmese, Jr., *Recent Developments in New York Law: Holding that an Insurance Company Had No Duty to Disclose a Life-Threatening Medical Condition Highlights the Need for a New Approach*, 76 ST. JOHN'S L. REV. 1047 (2002) (arguing that courts should impose a duty).

[16] *See* 397 F.3d 897 (10th Cir. 2005).

information sufficient to cause a reasonable applicant to inquire further."  The court stated:

> By encouraging the Pehles to purchase life insurance through them, Farm Bureau purported to act with the Pehles' best interests in mind.  In submitting to a procedure for extraction and consenting to an examination of their blood, the Pehles demonstrated that Farm Bureau had gained their confidence.  We do not think that insurance companies must exist to treat or diagnose HIV in order for a duty to arise that necessitates that applicants be properly put on notice to inquire further....We must inquire who is in 'the best position to guard against...injury.'

Although the panel was divided, it is sufficient here to note that the court reached its decision largely after characterizing the relationship between the insurer and the applicant as one of trust and confidence, a position rejected by Louisiana and in any event not sustainable on the facts here.  Given Louisiana law, we cannot follow *Pehle* here.

Finally, the McLachlans make a related argument that "negligent misrepresentation" actually encompasses two theories: negligent misrepresentation causing pecuniary harm, governed by RESTATEMENT (SECOND) OF TORTS § 552 and requiring that the statements were made in the course of business or employment, and negligent misrepresentation causing physical harm, governed by RESTATEMENT (SECOND) OF TORTS § 311 and, as comment (c) to that section recognizes, covering even gratuitous statements not made in the course of business or for the speaker's benefit, that is,

statements made by anyone.[17]  The McLachlans argue that the district court missed the distinction, analyzing only the first theory and citing cases, which required privity or a fiduciary relationship, relevant only to the first theory.  Although "Louisiana jurisprudence has not thoroughly developed" the latter cause of action, they assert, Louisiana courts have suggested it exists: in *Devore v. Hobart Manufacturing Company*,[18] the Louisiana Supreme Court highlighted the exact distinction at issue and cited both *Restatement* provisions in holding that its case was a pecuniary loss case governed by § 552.[19]

*Devore* only alluded to the possibility of a § 311 claim.  More importantly, § 311 - like § 552 - by its own terms requires an affirmative misstatement, not just a non-disclosure.  That is, § 311 declares that when someone makes a statement that might otherwise cause physical harm, as when someone having a business relationship with the plaintiff makes a statement that might otherwise cause pecuniary harm under § 522, he must be truthful.  Section § 311 does not impose an affirmative duty to warn everyone of the risk of physical harm.  Although Louisiana has extended the

[17] Section 311 references § 552, stating that § 311 is "somewhat broader."  Of course, § 311 still requires that the plaintiff have made "reasonable reliance" on the statement, a requirement that probably will, in most circumstances, imply some sort of relationship between the parties, but there is no express requirement of a business relationship.

[18] 367 So. 2d 836, 839 (La. 1979).

[19] They also cite *Daye v. General Motors Corp.*, 720 So.2d 654 (La. 1998), but that case seems to require privity or a fiduciary relationship for all negligent misrepresentation claims, although the court doesn't address the "two theories" possibility.

"negligent misrepresentation" theory to include situations of non-disclosure, it has done so - implicitly under and as an extension to § 552 - where there was some sort of business relationship making it reasonable to imply an affirmative duty.[20] Which is why the relevant cases required privity or a fiduciary relationship. We are unwilling to create an affirmative duty to disclose under § 311, a duty that would require everyone to warn everyone else of various physical dangers, regardless of the relationship.

B

The McLachlans assert that New York Life assumed a duty to disclose the elevated creatinine when it elected to disclos the elevated alkaline phosphatase. Under Louisiana law, a party assumes a duty to disclose if it makes a statement which a reasonable person would think is a complete, accurate statement as to certain matters.[21] Here, New York Life disclosed the high alkaline phosphatase levels only to explain to McLachlan why his premium would be high, not for his well-being, and it made no representations about the comprehensiveness of its tests or the intent behind them. As the lower court stated, "McLachlan could

---

[20] *See supra* note 7 and accompanying text.

[21] *See Dornak v. Lafayette Gen. Hosp.*, 399 So. 2d 168, 170-171 (La. 1981); *see also Ratliff v. State*, 844 So. 2d 926 (La. App. 2003) (holding that state had assumed duty to ensure that bridge was properly maintained by sending out inspectors to inspect bridge); *Creel v. Southern Natural Gas Co.*, 917 So. 2d 491, 499-500 (La. App. 1995) (holding that in maintaining strip of land and discussing location of right of way with landowner, gas company assumed duty not to mislead landowner as to location of right of way). Although most cases involve an assumed duty other than a duty to disclose, *Dornak* makes clear that one can assume a duty to disclose.

11

not have reasonably understood New York Life's communication to indicate either that he had a clean bill of health apart from what was reported or that New York Life would undertake to protect him from future maladies." A reasonable person would have thought that New York Life did the tests only for its benefit and reported only what it thought actuarially relevant, not medically relevant. Moreover, as the district court noted, if McLachlan "held any misconceptions about the purposes of the blood work at the time his blood was drawn, receiving notice of an increased premium ought to have corrected them."

As they did below, the McLachlans rely primarily on *Dornak v. Lafayette General Hospital*.[22] In *Dornak*, a hospital's examination of Dornak for the purpose of determining her fitness for employment revealed tuberculosis. The hospital later hired Dornak, without disclosing to her the test results. The Louisiana Supreme Court found that by undertaking the exam and employing her, the hospital assumed a duty to disclose the results. The district court here stated:

> *Dornak* is distinguishable from the context presented here. The *Dornak* plaintiff could reasonably expect that the hospital had voluntarily undertaken to render services to protect plaintiff's health because 'she was employed by the hospital to perform duties placing her in contact with co-employees and hospital patients.' [citing *Dornak*]. The hospital's examination in *Dornak*, unlike New York Life's tests, was performed because it had a special interest in certifying Dornak's suitability to work with patients. When the hospital hired her,

---

[22] 399 So. 2d 168 (La. 1981).

> Dornak quite reasonably understood that she was in fact healthy in the opinion of the examining doctor. Furthermore, a doctor examined Dornak; New York Life merely sent Mr. McLachlan's blood sample to a lab. Individuals have a right to expect a certain degree of care and disclosure when a doctor is directly involved. [citing *Deramus*'s distinction of *Dornak*].

We agree. Put in simpler terms, most employers don't check their prospective employees' health, so when they do, there is an argument that the employees might rely on the employer's tests and representations. Indeed, a Louisiana appellate court has subsequently held that *Dornak* limited itself to pre-employment physical exams.[23] In the end, the present case is more like *Gilbert v. B.D.O.W.S., Inc.*,[24] where a Louisiana appellate court held that an insurer's inspection of a swimming pool to determine if it met underwriting requirements did not mean the insurer had assumed a duty to inform the pool owner of the pool's safety.

IV

Finally, the McLachlans claim that the district court made two findings of fact improper on a motion to dismiss. First, that New York Life disclosed the phosphatase and didn't disclose the creatinine because only the former was relevant to its underwriting, when possibly the creatinine should have had underwriting significance under New York Life policy but didn't or that it had underwriting significance but wasn't disclosed,

---

[23] *See Thomas v. Kenton*, 425 So. 2d 396 (La. App. 1982).

[24] 711 So. 2d 765 (La. App. 1998).

13

intentionally or by mistake.  This, it is argued, is suggested by the fact that New York Life ordered a creatinine test in the first place.  Second, that McLachlan could not reasonably have understood the partial disclosure to be a full disclosure.  New York Life responds that the McLachlans in their own complaint averred the first fact, and that the second "fact" is a conclusion of law.  The first fact, even if true, wouldn't create a duty.  And the second "fact" is a conclusion of law.

V

The district court's ruling is AFFIRMED.  We do not find the applicable Louisiana law to be uncertain and DENY the McLachlans' motion to certify questions to the Louisiana Supreme Court.